UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
<u>HAMMOND DIVISION</u>

| | |
|---|---|
| ROGER TOWNSEND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CASE NO. 2:03CV 239 RL |
| ) | |
| INDIANA-AMERICAN WATER ) | |
| CORP., ) | |
| ) | |
| Defendant. ) | |

**<u>DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

**I.     <u>INTRODUCTION</u>**

Defendant Indiana-American Water Corp., properly identified as Indiana-American Water Company, Inc. ("Indiana-American"), has moved for summary judgment on each of the claims of Plaintiff Roger Townsend ("Townsend"). Indiana-American is entitled to summary judgment because, even when all reasonable inferences in Townsend's favor are drawn, the evidence of record does not prove, or tend to prove, Townsend's claims of a hostile work environment or disparate treatment on the basis of race.

**II.     <u>STATEMENT OF MATERIAL UNDISPUTED FACTS</u>**

The Northwest Operations of Indiana-American services a population of approximately 250,000 people in a number of towns, cities, and communities in Northwest Indiana, including Gary, Hobart, Merrillville, Winfield, Crown Point, Lake Station, New Chicago, Shererville, Portage, South Haven, Chesterton, Burns Harbor, Porter, Shorewood, and Ogden Dunes.

(Vaughn Aff., Tab A, ¶ 5).[1]  Indiana-American's Distribution Service Center, which provides services throughout Northwest Indiana, is located in Gary.[2]  Approximately fifty-four (54) hourly, union employees, including Field Service Representatives and Meter Readers, work out of this facility.  (Tab A, ¶ 6).  Of these employees, 17 are minorities (14 black employees and 3 Hispanic employees).  (*Id.*).  These employees are represented by the United Steel Workers of America, Local Union 13584.  (*Id.*).

Townsend, who is black, began working for Gary-Hobart Water Company ("Gary-Hobart") in 1984 as a Meter Reader.  (Townsend Dep.,[3] Tab B, p. 12).  Gary-Hobart's water utility operation became Northwest Indiana Water Company in approximately the mid-1990s.  (Tab A, ¶ 2).  Indiana-American purchased the assets of this water utility operation in June of 1999 and, shortly thereafter, brought in Robert J. Vaughn ("Vaughn") to be Vice President and Manager of Northwest Operations.  (Tab A, ¶¶ 2, 3).

Indiana-American's policies prohibit discrimination and harassment based on race.  (Tab A, ¶ 8, Ex. 2).  The Indiana-American workforce received formal, mandatory anti-discrimination/anti-harassment training on company time in June 2000, not long after Indiana-American purchased the operation.  (*Id.*).  Gary management also addressed its commitment to a workforce free of discrimination and/or harassment during additional meetings and/or training sessions.  (*Id.*).  The company's policy was known to Townsend, and Townsend understood that the policy prohibited discrimination and harassment based upon race.  (Tab B, p. 15).

---

[1] Robert J. Vaughn's Affidavit is produced at Tab A of the accompanying Appendix.  All other exhibits referenced herein are included in Indiana-American's Appendix and are designated as "Tab __."

[2] The Northwest Operations of Indiana-American includes two water filtration plants and a Distribution Service Center.  One of the water plants and the Distribution Service Center are located in Gary, Indiana.  (Tab A, ¶ 4).

[3] Pertinent excerpts from Townsend's deposition taken in this case on December 18, 2003 are produced in the accompanying Appendix at Tab B.

On September 3, 2002, as an administrative prerequisite to the instant lawsuit, Townsend filed an administrative charge of discrimination (Townsend's "Charge") with the Gary Human Relations Commission. (Tab B, p. 25, Ex. 196). In his Charge, Townsend alleged only that he was passed over for "several positions" that were eventually filled by white employees. (*Id.*). In this lawsuit, Townsend makes a claim of disparate treatment related to the termination of his employment. He also alleges three instances of harassment which exceed the scope of his administrative charge. None of these claims should survive summary judgment.

The focus of this lawsuit is the manner in which Townsend was treated by Indiana-American after he incurred an injury in September of 1999. (Tab B, pp. 39-40). Specifically, Townsend alleges that due to his race: (1) he was asked to perform work which he thought exceeded his medical restrictions; and (2) he was laid off (and not recalled) despite his belief that suitable work was available. (Tab B, p. 39). Townsend also makes a half-hearted attempt to claim racial harassment, focusing on just three isolated incidents that do not appear to be related in any way to race.

**A.     Townsend's Employment with Indiana-American**

    **1.     Townsend's Physical Limitations**

Townsend was injured in September of 1999. (Tab B, p. 30). After his injury, Townsend underwent surgery on or about April 26, 2000. (Tab B, p. 31). As a result of his injury and the subsequent surgery, Townsend was put on temporary light duty. (Tab B, pp. 30-32). At the beginning of October 2000, however, Townsend's doctor determined that Townsend had reached "maximum medical improvement" and therefore his restrictions were deemed permanent. (Tab B, p. 19). At that time, Townsend was unable to: (1) lift over twenty (20) pounds on an occasional basis; (2) repetitively lift, twist, or bend; (3) climb stairs more than occasionally;

(4) squat repetitively or for sustained periods of time; or (5) bend for prolonged periods. (*Id.* at p. 15, Ex. 428).

Due to these permanent restrictions, a meeting was held on October 2, 2000, between Indiana-American management, Townsend, and representatives of his union. (Tab B, pp. 15-16). At the meeting it was determined that Townsend was unable to perform the functions of any available position with the company. (Tab B, pp. 16-17). Since Townsend could not perform any available position, he was put on a medical leave of absence. (*Id.*; Tab A, ¶ 7). According to the collective bargaining agreement between Townsend's Union and Indiana-American, Townsend was entitled to be away form work on leave for up to twenty-four (24) months. (Tab B, pp. 24-25, 46; Tab A, Ex. 4).

Townsend was informed at the October 2, 2000 meeting that should his medical status improve, he must notify the company in order to be reconsidered for employment. (Tab B, pp. 23-24). Townsend admits that he did not notify the company of any improvement in his medical status in the twenty-four (24) months following October 3, 2000. (Tab B, pp. 24, 46). Townsend's employment was therefore terminated on October 3, 2002 pursuant to the collective bargaining agreement. (Tab B, pp. 45-46).

### 2. **Indiana-American's Light-Duty Policy: Light Duty as a Temporary Measure**

Indiana-American does not maintain and will not create "light duty" jobs as regular long-term positions. (Tab A, ¶ 14 & Ex. 3). By policy, an employee's job assignment may be modified temporarily to include less physically demanding work as a temporary measure. (*Id.*). Company policy currently limits a light duty assignment to 30 days; before 2003, however, company policy provided for 60-day assignments. (*Id.*). Under company policy, if, at the end of the allowed light duty period, the employee is not ready to resume his regular duties, the light

4

duty assignment nonetheless ends. (*Id.*). Further, once an employee's healthcare provider indicates that the employee's restrictions are permanent or that he has reached "maximum medical improvement," the employee is no longer qualified for a temporary light duty assignment. (*Id.*).

### 3. The Meter Shop

Employees who required a *temporary* light-duty assignment have been assigned to work in the Meter Shop. (Tab A, ¶ 14). The Meter Shop is a room in the Distribution Service Center where meters are tested and repaired, equipment is stored, and Field Service Representatives receive assignments and supplies each day before going out in the field. (Tab A, ¶ 9).

Dennis Hamilton ("Hamilton"), an hourly employee with more seniority than Townsend, is the only employee who has a regular assignment to the Meter Shop. (Tab B, pp. 26-27; Tab A, ¶ 9). In addition to his duties in the Meter Shop, Hamilton performs field service responsibilities in Service Area 12 and in other service areas as needed. (Tab A, ¶ 9). On a typical day, Hamilton checks in meters returned by other Field Service Representatives, tests the returned meters to see whether they are in need of repair, performs certain repairs, inventories supplies in the Meter Shop, and makes sure that other Field Service Representatives get the supplies they need from the Meter Shop. (*Id.*). Others work in the Meter Shop on temporary light duty or in conjunction with their Field Service Representative duties in the field require. (Tab B, pp. 28, 30).

### B. Townsend's Claims

During his deposition in this case, Townsend was asked to identify those acts he thinks constitute discrimination against him on the basis of his race. (Tab B, p. 39). Townsend claims that due to his race: (1) he was asked to perform work that exceeded his medical limitations; and

(2) he was laid off when he could have continued to work in the Meter Shop.[4]  (*Id.*).  While Townsend generically claims in his Complaint that he was subject to a hostile work environment, no facts supporting this assertion were identified in his deposition.  This is understandable since, at the time of his Charge, Townsend had not worked a day at Indiana-American in approximately two years.  Although Indiana-American maintains that most, if not all of Townsend's claims are beyond the scope of his Charge, Indiana-American will set forth the material and undisputed facts relating to each of Townsend's claims in turn.

### 1.      Exceeding Medical Restrictions

Prior to Townsend's layoff in October of 2000, Townsend claims that he was asked to perform work that exceeded his medically imposed restrictions.  (*Id.* at pp. 35-36, 38).  Moreover, Townsend believes that he was asked to violate the restrictions because of his race.  (*Id.*).  The sum total of the evidence on this point is Townsend's recollection that *once* in October of 1999 and *once* in July of 2000 he was sent out to perform regular duty work which allegedly violated his medical restrictions.  (*Id.*).

### 2.      Denial of Opportunity to Work in the Meter Shop

Until approximately 2001, Indiana-American maintained a large number of aged or broken meters of various sizes in the Meter Shop.  (Tab A, ¶ 10).  Maintaining meters involves taking aged or broken meters apart and scrapping certain components and keeping certain components for the repair of other meters.  (*Id.*).  Since approximately 2001, Indiana-American has chosen to scrap in their entirety most small meters that are changed for age or disrepair.  (*Id.*).  Scrapping small meters in their entirety has greatly reduced the amount of work in the Meter Shop and the number of people needed to work in it.  (*Id.*).  As noted above, only one

---

[4] Townsend was allowed to work in the Meter Shop longer than the sixty (60) days allowed by company policy.  (Tab B, p. 31).

employee is assigned to the Meter Shop on a regular basis and even that employee spends only a portion of his work time in the Meter Shop, a change from when he was first assigned there in 2000. (Tab A, ¶¶ 9 & 10). Others work in the Meter Shop due to temporary light-duty assignments or because their regular field service duties require working on large meters. (Tab B, pp. 28, 30).

Townsend contends that he has been denied the opportunity to work on a regular basis in the Meter Shop due to his race. (Tab B, pp. 25-26, 33). Yet, there are no regular, full-time positions available in the Meter Shop and even if there were they would be for reserved for temporary light-duty work assignments. Townsend attempts to identify several coworkers who have been permitted to work in the Meter Shop, but he concedes that these individuals work in the Meter Shop *in addition* to their jobs in the field. (Tab B, pp. 28, 30). Moreover, these individuals generally work in the Meter Shop repairing large meters, a function that Townsend admittedly cannot perform. (*Id.* at pp. 30, 42). The lone employee who is regularly assigned to the Meter Shop: (1) has more seniority than Townsend and (2) performs some field representative work that Townsend admits he could not. (Tab A, ¶ 9; Tab B, pp. 26-27).

Townsend briefly mentions a few other positions which he could "probably" perform, but immediately admits that he knows of no openings in regard to these positions and even concedes that he does not know what functions these positions entail. (Tab B, pp. 20-22).

### 3. <u>Isolated Non-Racial Incidents</u>

Townsend has stated that the alleged harassment he encountered "was a culmination of things" while "[i]t wasn't so much one thing in particular." (Tab B, p. 44). However, when questioned about the types of things that made up this cumulative harassment, he could identify only three. (*Id.* at pp. 17, 36, 44-45). Moreover, of the three incidents, Townsend could not articulate how any of them related to his race.

7

First, Townsend alleges that on one occasion he was overpaid by Indiana-American and was subsequently asked to repay the funds.  (*Id.* at p. 44).  While apparently not disputing that he had been overpaid or that he did in fact owe the debt, he alleges that the terms of the repayment plan were harsh and that this was a result of his race.  (*Id.* at pp. 44-45).  That being said, Townsend admits that:  (1) he was allowed to negotiate the repayment plan; and (2) the negotiations resulted in a twenty-five percent (25%) reduction in the initial amount withheld per paycheck.  (*Id.* at p. 44).  Moreover, he points to nothing which even hints that the repayment terms were influenced by his race.

Second, Townsend contends that on one occasion he telephoned company representative Pete Bastasich ("Bastasich") and Bastasich "sounded angry about [Townsend] not being able to perform [his] duties."  (*Id.* at p. 36).  Specifically, Townsend contends that he was told the following: "well, you've been off of work, you've had the surgery, and now you still can't perform your job." (*Id.*).  Townsend's entire complaint regarding this conversation is the tone of voice used.  Additionally, Townsend provides no link between his race and how the company representative "sounded."

Third, and finally, Townsend points to an incident that occurred around the time of his layoff.  Townsend alleges that Bastasich commented on Townsend's limp by stating "something to the effect that[, ']I just saw you walking through here a minute ago, and you were looking bad.[']"  (*Id.* at p. 17).  Again, Townsend does not even attempt to link this to his race or even articulate how this was harassment.

### III.   ARGUMENT AND AUTHORITY

Even construing all disputed facts in Townsend's favor, this case requires the entry of summary judgment in favor of Indiana-American.  Townsend defined his claims during his

8

deposition, making it clear that he makes two types of claims in this lawsuit: (1) disparate treatment; and (2) hostile work environment. Both categories of claims fail as a matter of law. First, many of Townsend's claims are outside of the scope of his Charge. Second, even if the Court were to find that the allegations are both reasonably related to the claims raised in the Charge and within the 300-day limitations period, they fail under the substantive requirements of applicable law.

A.     **Townsend's Claims are Outside of the Scope of His Charge**

In this lawsuit, Townsend is limited to events within the scope of his Charge. With respect to any claims of disparate treatment alleged by Townsend under Title VII, the applicable limitations period is well-established. For Title VII claims, the statute of limitations in a deferral state such as Indiana is 300 days, calculated from the date the claim is filed with the EEOC or the appropriate state agency. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999); *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162-1163 (7th Cir. 1994); *Stokes v. Norfolk S. Ry. Co.*, 99 F. Supp.2d 966, 973 (N.D. Ind. 2000); *see also* 42 U.S.C. §2000e-5(e). As a general rule, a Title VII plaintiff is only allowed to pursue claims based upon conduct occurring within the limitations period. *Galloway v. General Motors Serv. Parts Oper.*, 78 F.3d 1164, 1166 (7th Cir. 1996). In this case, Townsend filed his Charge on September 3, 2002. Consequently, the 300-day limitations period places events at issue occurring between November 11, 2001 and September 3, 2002. Any alleged incident of disparate treatment preceding November 11, 2001 that Townsend attempts to advance is untimely.

In addition to the restrictions imposed by the applicable limitations period, Townsend's claims under Title VII are limited to those which were raised in his Charge. In order to bring a claim in federal court under Title VII, a plaintiff must first have raised it in a timely charge before the EEOC or an appropriate state agency. 42 U.S.C. §2000e-5. "'Generally a plaintiff

9

may not bring claims under Title VII that were not originally brought among the charges to the EEOC.'" *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002), quoting *Harper v. Godfrey Co.*, 45 F.3d 143, 147-48 (7th Cir. 1995).  Explaining the rationale for this requirement, the Seventh Circuit has noted that "[t]his rule both 'affords an opportunity for the EEOC to settle the dispute between the employee and employer and puts the employer on notice of the charge against it.'" *Id.*  While courts within the Seventh Circuit will allow plaintiffs to proceed on claims not explicitly set forth in a charge of discrimination if the claim is "like or reasonably related" to a charge which was filed, there must be a factual relationship between the claims.  *Id.*  "At a minimum," the EEOC charge and the complaint must "describe the same conduct and implicate the same individuals." *Id.*

Townsend now proffers two claims of disparate treatment, both of which occurred more than 300 days before he filed the Charge.  Townsend alleges that:  (1) he was asked to perform work that exceeded his medical limitations; and (2) he was laid off due to his physical restrictions.  The layoff occurred in October of 2000.  Thus, even if the allegations were true, they occurred prior to November 11, 2001 and are therefore outside the limitations period.

In this case, there is nothing in Townsend's Charge to suggest that he was subjected to a hostile work environment.  (Tab B, p. 25, Ex. 196).  As such, any claims based on an alleged hostile environment are beyond the scope of his Charge, are not properly before the Court, and are appropriately subject to the entry of summary judgment in favor of Indiana-American.  Moreover, as noted above, Townsend has not worked a single day at Indiana American since October of 2000.  This means that any claim of hostile work environment necessarily occurred prior to the 300-day limitations period and is therefore barred on this ground as well.

**B.     In any Event, Townsend's Disparate Treatment Claims Fail as a Matter of Law.**

Whatever the scope of the alleged discriminatory actions found to be within the scope of his administrative charge, Townsend's allegations of disparate treatment cannot survive summary judgment.  Townsend's disparate treatment claims fail because race was not a "determining factor" or a "but for" element of the identified employment decisions.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *EEOC v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145 (7th Cir. 1996); *Day v. Northern Ind. Pub. Serv. Co.*, 987 F. Supp. 1105 (N.D. Ind. 1997).  To prevail, Townsend must prove by a preponderance of the evidence that he was discriminated against because of his race.  He may meet his burden of persuasion by either (1) presenting direct or circumstantial evidence that race was a determining factor in the employment decisions at issue, or (2) indirectly by utilizing a burden-shifting approach.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989); *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 896 (7th Cir. 2003).  Townsend, however, has no direct evidence to support his claims.

Because Townsend cannot directly meet his burden, he must prove by a preponderance of the evidence a *prima facie* case of discrimination under the burden-shifting approach set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Johnson*, 325 F.3d at 897 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  Townsend must establish the four elements of a *prima facie* case of discrimination for each claim of disparate treatment:

1.     that he is a member of a protected class;

2.     that he was qualified for the job sought or was meeting Indiana-American's legitimate expectations;

3.     that he suffered an adverse employment action; and

> 4. that Indiana-American treated similarly situated employees outside of the protected class more favorably.

*Ajayi v. Aramark Business Servs.*, 336 F.3d 520, 531 (7th Cir. 2003).

If Townsend establishes a *prima facie* case, the burden of production shifts to Indiana-American to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Johnson*, 325 F.3d at 897 (citing *Reeves*, 530 U.S. at 142).  The ultimate burden of persuasion, however, remains with Townsend, who must prove by a preponderance of the evidence that the reason is a mere pretext <u>and</u> that discrimination occurred.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253; *see also Ajayi*, 336 F.3d at 531.  "Pretext is a lie, not merely a mistake." *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000).  To meet this burden, Townsend may not simply rely on the allegations presented in support of his *prima facie* case.  *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 661 (7th Cir. 1993).

### 1. Townsend's Disparate Treatment Claims Fail Because He Cannot Establish a *Prima Facie* Case of Discrimination

As a preliminary matter, Townsend's disparate treatment claims fail because he cannot establish a *prima facie* case.  As noted above, one aspect of proving a *prima facie* case is proffering evidence of an "adverse employment action" that resulted in "material harm."  *Ajayi*, 336 F.3d at 531.  Specifically, an "employee must show that material harm has resulted from . . . the challenged actions."  *Traylor v. Brown*, 295 F. 3d 783, 788 (7th Cir. 2002).  Clearly, not everything that makes an employee unhappy is an actionable adverse action.  *Smart v. Ball State Univ.*, 89 F.3d 437, 441-42 (7th Cir. 1996).  For instance, oral and written reprimands under a progressive discipline policy are not "adverse employment actions" where the reprimands do not implicate "tangible job consequences."  *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001); *see also Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).  Nor is a transfer of teacher from one school to another an adverse employment action.  *Benedict v. Eau Claire Pub. Schools*,

1998 U.S. App. LEXIS 2138 (7th Cir. Feb. 10, 1998), *cert. denied*, 119 S.Ct. 58 (1998). Similarly, a retaliatory lower job evaluation, loss of a $600 bonus, and workplace restrictions are not an adverse employment action. *Rabinovitz v. Pena*, 89 F.3d 482, 487-88 (7th Cir. 1996).

Townsend's initial disparate treatment claim, that he was twice asked to exceed his medical restrictions, fails because he cannot establish a *prima facie* case. Specifically, Townsend cannot identify a material adverse action. Townsend's hazy memory of these two discrete events reveals that he suffered no reprimand, loss in pay, or demotion and was not adversely affected physically in any way. Quite simply, how was Townsend harmed?

In addition to demonstrating an adverse action, Townsend must also show that Indiana-American treated similarly-situated white employees more favorably than him. Townsend's only other claim of disparate treatment fails in this regard. In regard to Townsend's claim that he was laid off when he could have continued to work in the Meter Shop, Townsend has produced no evidence of any similarly-situated employee or indicated how such an employee received more favorable treatment than him in a comparable situation. *See Greer v. Board of Education of the City of Chicago, IL*, 267 F.3d 723, 728 (7th Cir. 2001) (a person must be "similarly situated" in all material respects); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (plaintiff must show "substantial" similarity). In fact, Townsend admits that: (1) he knows of no white employee with the same permanent restrictions as those he had; and (2) the only employee regularly employed in the Meter Shop has more seniority than Townsend and is able to perform field duties that Townsend physically cannot. (Tab B, pp. 23, 27).

Townsend did return to work after being off work for twenty-four (24) months and was terminated pursuant to his union's collective bargaining agreement with Indiana-American. (Tab A, Exs. 4 & 5). Jeff Scott, a Caucasian employee, was similarly treated when he did not return to

13

work after being off for twenty-four (24) months.  (*Id.* at Exs. 4 & 6).  A copy of the termination letter Indiana-American sent to Scott is attached to Vaughn's Affidavit as Exhibit 6.  Scott had been placed on leave when he was unable to perform any available position with the company.  Exactly two (2) years later Scott was terminated, as his condition had not improved and he remained unable to perform the essential duties of any available position.  This is what transpired in Townsend's case.  Townsend was treated as required by the union contract and the same as a similarly-situated white employee.  (Tab A, Ex. 5).

Finally, in regard to both claims of disparate treatment, Townsend cannot show that he was qualified for an open position for which he applied.  Townsend "is not entitled to call into question the veracity or motives of his employer unless he first demonstrates that he was meeting [or could meet] the employer's legitimate workplace expectations."  *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1064 (7th Cir. 2003) (quoting *Peele v. Country Mut. Life Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002)).  Townsend has significant physical restrictions which prevent him from performing both his previous duties as well as the essential functions of any position available with the company.  (Tab B, p. 15, Ex. 428).  Since Townsend cannot perform the essential functions of any position, he is neither qualified for any job at the company, nor could meet the company's legitimate expectations.  Townsend fails to establish a *prima facie* case for this reason as well.

### 2. **Townsend's Disparate Treatment Claims Fail Because He Cannot Dispute Indiana-American's Legitimate, Nondiscriminatory Reasons for its Decisions.**

Townsend's claims also fail because he cannot dispute Indiana-American's legitimate, nondiscriminatory reasons for its decisions.  Townsend cannot second-guess the company's decisions, offering only his own unsubstantiated opinions to refute Indiana-American's legitimate non-discriminatory bases for its actions.  In October of 2000, when Townsend reached

14

"maximum medical improvement" and it was clear that he could not perform any available position at Indiana-American, he was placed on layoff status. Two years later, with no change in Townsend's condition, Townsend was terminated in accordance with the union contract. Townsend has no admissible evidence to show that the proffered reasons for Indiana-American's decisions are a pretext for discrimination. Consequently, even if Townsend could establish a *prima facie* case as to any of his disparate treatment claims, those claims must fail as a matter of law. Townsend's claim of a hostile work environment, addressed below, must be similarly rejected.

C.  **Townsend Cannot Meet the Hostile Environment Standard Set by the Supreme Court and the Seventh Circuit Court of Appeals**

The United States Supreme Court has recognized that hostile environment harassment claims are cognizable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986). Although *Meritor* dealt specifically with a claim of sexual harassment, the Court has stated that "hostile work environment clams based on racial harassment are reviewed under the same standard as those based on sexual harassment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786-87 and n.1 (1998); *Meritor*, 477 U.S. at 66-67)).

In hostile environment cases, the "threshold [inquiry] . . . is whether the instances of harassment alleged by the plaintiff rise to the level of 'hostility' offensive enough to be considered actionable." *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 213 (7th Cir. 1986), *overruled on other grounds by Saxton v. American Tel. & Tel. Col*, 10 F.3d 526 (7th Cir. 1993). Title VII is not designed to outlaw the merely unpleasant or mildly offensive working environment, or to purge the workplace of vulgarity. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995); *see also Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) ("Conduct that

is not severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive . . . is beyond Title VII's purview"). "The workplace that is actionable is the one that is 'hellish'." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (citing *Baskerville*, 50 F.3d at 430). Isolated and innocuous incidents may not support a hostile environment claim. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir. 1994).

"In order to be actionable, . . . [an] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (1998) (citing *Harris*, 510 U.S. at 21-22). The workplace must be "permeated with discriminatory intimidation, ridicule and insult . . . that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citation omitted). Only extreme conduct is actionable under Title VII. As the Supreme Court has held:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' (citations omitted). Properly applied, they will filter out complaints attacking the 'ordinary tribulations of the workplace, such as the sporadic use of abusive, [race]-related jokes, and occasional teasing.' (citations omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . .

*Faragher*, 524 U.S. at 788.

To establish the existence of a racially hostile environment, a plaintiff must show a steady barrage of racial enmity, not just a few isolated incidents. *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (no racially hostile environment where employee complained of only two overtly racial remarks and one arguably racial comment, none of the alleged ridicule was overtly racial, and employee was not singled out for abuse); *see also North v. Madison Area Ass'n for Retarded Citizens-Developmental Ctrs. Corp.*, 844 F.2d 401 (7th Cir. 1988) (two or

16

three statements by plaintiff's co-workers which might be considered as racial slurs were not sufficiently severe or pervasive to create a hostile work environment); *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (racially offensive poster and joking comments were not sufficiently severe or pervasive to alter working environment); *Gilbert v. City of Little Rock*, 722 F.2d 1390 (8th Cir. 1983) (racial remarks and derogatory epithets by white police officers, the existence of racial graffiti in restrooms, and the posting of a racial cartoon on the bulletin board at police headquarters did not rise to a level of Title VII violation); *Johnson v. Brown*, 1998 U.S. Dist. LEXIS 3612, *21 (N.D. Ill. March 19, 1998) (comment by supervisor to plaintiff that the employer was "going to *fire your black ass*, you're defrauding the government" was insufficient to establish a hostile work environment).  Furthermore, the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the conditions of employment to a sufficient degree to violate Title VII; *McCray v. DPC Indus., Inc.*, 942 F. Supp. 288, 293 (E.D. Tex. 1996) (employee's claims that his foreman called him a "black Yankee" and "son" and insulted three black political leaders three to five times during the time he worked for employer, that foreman and a truck driver each told a racial joke, that another truck driver called employee a racial epithet, and that foreman and employee had a physical altercation were insufficient to constitute a hostile work environment under Title VII).

Townsend's claims fail under both the subjective and objective analysis required by controlling authority.  On the objective level, Townsend alleges, at best, isolated and innocuous incidents.  Even taken together, however, the incidents do not approach the deeply offensive and harassing behavior necessary to create a hostile work environment.  *See Scott,* 798 F.2d 210 at 213 (in the sexual harassment context, finding that repeated propositions, a slap on the behind and explicit sexual comments did not establish a hostile work environment).  Merely vulgar and

17

mildly offensive workplace behavior does not amount to a hostile work environment. *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333 (7th Cir. 1993); *Baskerville*, 50 F.3d at 430.

If Townsend found the "harassment" subjectively hostile, he kept it to himself. Despite being aware that company policy required him to report any such harassment, he did not "make any complaint of harassment or discrimination on the basis of [his] race to any representative of the Indiana-American Water Company." (Tab B, p. 79-80). In fact, in regard to any complaint to Indiana-American management, Townsend "never mentioned race." (*Id.* at 83). As close as Townsend gets is a complaint to a member of management of the Gary-Hobart Water Company in 1992, which "wasn't necessarily in terms of race." (*Id.* at 80).

In fact, Townsend's claims do not relate to race, which precludes any consideration of them. In *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998), the Supreme Court, in the context of sexual harassment, cautioned:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discrimination* . . . because of . . . sex." . . . The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to *which members of the other sex are not exposed.*

*Id.* at 80 (emphasis added). Similarly, Townsend must show that he was exposed to the alleged harassment *because of* his race. He cannot make such a showing in regard to any of his claims.

The events alleged by Townsend, which all occurred before his layoff in 2000, simply do not constitute the "steady barrage of racial enmity" necessary to support his hostile work environment claim. Neither individually nor collectively do Townsend's alleged instances of harassment establish a hostile work environment — a "hellish" environment *based on race*.

## IV.    CONCLUSION

Indiana-American requests that the Court put an end to this case.  As a preliminary matter, Townsend's disparate treatment claims must be limited to the scope of his Charge.  Allegations exceeding the scope of his Charge, including the applicable limitations period, must fail for this reason standing alone.  In any event, Townsend's disparate treatment claim fails because he cannot establish a *prima facie* case and he cannot prove pretext.  On Townsend's hostile environment claim, Townsend's claims of harassment are too petty to rise to the level of a hostile environment and are wholly unrelated to race.  Townsend's environment was neither subjectively or objectively hostile.  As a result, Indiana-American is entitled to summary judgment on all of Townsend's claims.

Respectfully submitted,

s/Kathleen M. Anderson_____
Kathleen M. Anderson (#16351-92)
Shaun E. Graham (#18656-49)
BARNES & THORNBURG LLP
600 One Summit Square
Fort Wayne, IN  46802
Telephone:  (260) 425-4657
Facsimile:  (260) 424-8316

ATTORNEYS FOR THE DEFENDANT
INDIANA-AMERICAN WATER CO., INC.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the above and foregoing document has been served this 31st day of March, 2004, by depositing a copy of the same in the United States mail, first-class postage prepaid and properly addressed to the following counsel of record:

>Noah L. Holcomb, Jr.
>1919 East Columbus Drive
>East Chicago, Indiana 46312

>s/Kathleen M. Anderson_____
>Kathleen M. Anderson

FWDS01 JCLAGG 179942v2